JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Vincent Quinones, appeals from a judgment of the Berea Municipal Court, finding him guilty of operating under the influence, continuous lanes of traffic/weaving, speeding, and failure to wear a seat belt, as well as imposing court costs for each offense. After reviewing the evidence, we affirm in part, reverse in part, and remand.
 {¶ 2} On November 17, 2005, Middleburg Heights Police Officer Raymond Bulka ("Officer Bulka"), issued a citation to Quinones for operating a motor vehicle while under the influence of alcohol or drugs ("OMVI"), in violation of Middleburg Heights Ordinance ("MHO") 434.01(a)(1); continuous lanes/weaving, in violation of MHO 432.08(a); speeding, for traveling fifty-three m.p.h. in a twenty-five m.p.h. zone, in violation of MHO 434.03(b)(2); and failure to wear a seat belt, in violation of MHO 438.275(b)(1). Officer Bulka also filed an Administrative License Suspension Form *Page 3 
2255 with the Ohio Bureau of Motor Vehicles. Quinones entered a plea of not guilty to the charges.
 {¶ 3} A bench trial commenced on March 2, 2006. The city presented Officer Bulka as its only witness. He testified that on November 17, 2005 at approximately 12:20 a.m., he was on routine patrol on Fowles Road, Middleburg Heights, Ohio. He observed Quinones' vehicle traveling at what he visually estimated to be around fifty m.p.h in a twenty-five m.p.h. zone. He said that he also noticed that Quinones' vehicle was weaving.
 {¶ 4} Officer Bulka attempted to catch up with Quinones' vehicle to "pace" it. He stated that his patrol car was equipped with a Gemini radar detector. He used it to check his speedometer reading, but he did not use it to record the speed of Quinones' vehicle. He testified that he was certified to operate a Gemini radar detector. He also indicated that he tested it at the beginning of his shift that day to make sure it was operating properly, and it was.
 {¶ 5} Officer Bulka paced Quinones' vehicle for three quarters of a mile. He explained that to pace the vehicle, he tried to keep an equal distance between his vehicle and Quinones', while counting and checking his speed. He estimated the vehicle to be traveling fifty-three m.p.h.
 {¶ 6} He further testified that while following Quinones on Fowles Road, which is a two-lane road, that "[occasionally he was going on the double yellow lines (inaudible) outside of his lane (inaudible) double yellow line." He indicated that the *Page 4 
lines on Fowles Road are clearly marked. He put his cruiser lights on and Quinones immediately pulled over.
 {¶ 7} When Officer Bulka approached Quinones' vehicle, he asked him for his driver's license, which Quinones gave him. While talking to Quinones, he smelled a strong odor of alcohol coming from the vehicle. He also noticed that Quinones' eyes were "glassy."[1] He said that he remembered asking Quinones if he had been drinking, but he could not remember what Quinones said. He then asked Quinones to step out of the vehicle "to conduct a battery of field sobriety tests."
 {¶ 8} Officer Bulka conducted three field sobriety tests; horizontal gaze nystagmus ("HGN"), one-leg stand, and walk-and-turn. He explained that when conducting the HGN test, an officer must look for "involuntary jerking of the eyeballs." There are six clues, three in each eye. The first is to look for "smooth pursuit," to determine if the eyes follow a stimulus smoothly, such as a pen or finger. If the eyes "jump" when following the stimulus, "then it's indicative that [the person has] been drinking."
 {¶ 9} Officer Bulka then stated, "[t]he next one is a full — I forgot what (inaudible) its all the way out." [sic] He further explained "[w]hen it's all the way out, and whether or not when they're looking at it, their eyes are bouncing around (inaudible) each side. And then as you come in towards their nose, wherever the — *Page 5 
it stops, the closer you are to their nose, the more they've had to drink." According to Officer Bulka, Quinones failed all six clues.[2]
 {¶ 10} Next, Officer Bulka administered the walk-and-turn test to Quinones. He explained that when giving the test, he demonstrates how to perform it. He tells the person to "stand heel to toe, stop, turn around * * * [t]ake nine steps back while keeping your arms out — your arms down towards your side as best as you can and count (inaudible)."
 {¶ 11} Officer Bulka testified that Quinones was able to walk, heel to toe, during the test. However, Quinones failed the test because he was not able to maintain his balance while listening to the instructions, he began to perform the test before the instructions were completed, he used his arms to balance himself, and lost his balance while walking.
 {¶ 12} Finally, Officer Bulka administered the one-leg-stand test to Quinones. He explained that he has the person stand in front of him, with his feet together, while he demonstrates the test. The person must "lift either foot off the ground approximately six to eight inches * * * straight out in front of them [sic]." Then, the person must keep his arms down and count by thousandths to thirty-five. *Page 6 
 {¶ 13} Officer Bulka testified that Quinones failed the one-leg-stand test. Quinones swayed while standing and was not able to keep one foot off the ground for thirty-five seconds. Quinones also put his foot down more than three times and started over. The city also asked Officer Bulka, "[a]nd when you stopped the vehicle was the defendant wearing his seat belt?" Officer Bulka replied, "[n]o."
 {¶ 14} Officer Bulka concluded that Quinones was intoxicated, arrested him, and took him to the police station. He stated that Quinones refused to take the breath test. Quinones signed the Bureau of Motor Vehicles 2255 Form, which indicated that Officer Bulka read him the consequences of refusing to take the breath test and the penalties that could result from refusing to take it.
 {¶ 15} On cross-examination, Officer Bulka stated that he obtained his radar certification in January 1989, but he did not bring it to trial. He also did not know if his certificate specifically stated that he was qualified to use a Gemini radar detector. In addition, he did not bring any certificates with him to court which showed that he was qualified to conduct field sobriety testing.
 {¶ 16} Officer Bulka further stated that he used mailboxes, telephone poles, and trees to pace Quinones' vehicle, but he could not estimate the distance between his cruiser and Quinones' vehicle. He also testified that he followed Quinones from the I-71 overpass to South Eastland, but could not say exactly how far that was.
 {¶ 17} Officer Bulka indicated that he has video equipment in his cruiser, which he manually activated after he began following Quinones. He explained that the *Page 7 
video cassette shows his police cruiser following Quinones to the point where he administered the first HGN test. During the HGN test that is shown on the video, Officer Bulka explained that Quinones was sitting in his vehicle with his neck turned in order to see him. Officer Bulka testified he has never been told that he should not perform a HGN test while the person was sitting in a vehicle with his neck turned. He then agreed that he gave Quinones a second HGN test when he got him out the vehicle. Officer Bulka stated that this second HGN test is not on the video cassette because "[t]he tape ran out" and he was not aware of it. The videotape was then played in court.
 {¶ 18} Officer Bulka was asked if the videotape showed that Quinones had driven left of center. He replied, "[h]e went out the line." When further asked if the tape indicated that, he answered, "[h]e didn't go into the other lane."
 {¶ 19} He also agreed with the prosecutor that the tape did not show any cars traveling in the other direction when he was following Quinones and that there was one car "traveling in the other direction after [he] stopped [Quinones]." Even after the trial judge disagreed and stated that he thought he saw a car "right at the beginning of the tape," Officer Bulka, when posed the question again, still could not remember if he saw a car at the beginning of the tape, when he began following Quinones.
 {¶ 20} This court has viewed the video that was admitted into evidence. The tape is approximately four minutes long. It shows Officer Bulka following Quinones *Page 8 
for approximately one minute before he effectuated a traffic stop. While he was following him, Quinones' vehicle touched the center, yellow line at least two times.
 {¶ 21} On redirect examination, Officer Bulka stated that he has been a police officer for seventeen years and that he successfully completed a three-day course in administering field sobriety tests. He also testified that it had been part of his duties throughout his career to conduct field sobriety tests.
 {¶ 22} The state then rested. Quinones moved for a Crim.R. 29 acquittal on each of the charges, which the trial court denied. The trial court then found Quinones guilty of all four charges.
 {¶ 23} On April 28, 2006, Quinones was sentenced to one year of probation and assessed fines and court costs for each offense. The trial court ordered Quinones to serve three days in jail or perform a seventy-two-hour program in lieu of jail. If he opted to serve three days in jail, then he also had to perform the seventy-two-hour program. The court further ordered Quinones to attend two Alcoholic Anonymous ("AA") meetings a week, for sixteen weeks. Additionally, the court revoked his driver's license, retroactive to November 17, 2005. His sentence was stayed pending appeal.
 {¶ 24} It is from this judgment that Quinones appeals, raising five assignments of error:
 {¶ 25} "[1.] The Trial Court erred in finding [Quinones] guilty of marked lanes or continuous lines of traffic. *Page 9 
 {¶ 26} "[2.] The Trial Court erred in finding [Quinones] guilty of speeding.
 {¶ 27} "[3.] The Trial Court erred in finding [Quinones] guilty of operating a vehicle under the influence of alcohol.
 {¶ 28} "[4.] The Trial Court erred in finding [Quinones] guilty of failure to wear a seat belt.
 {¶ 29} "[5.] The Trial Court's imposition of court costs for each offense in one case is excessive."
 {¶ 30} In Quinones' first four assignments of error, he maintains that the evidence was insufficient to sustain a conviction.
 {¶ 31} In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court of Ohio explained that sufficiency of the evidence and the weight of the evidence are not synonymous legal concepts. They are "both quantitatively and qualitatively different." Id. The high court further explained:
 {¶ 32} "With respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support a jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R.29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955),162 Ohio St. 486 * * *. In addition, a conviction based on *Page 10 
legally insufficient evidence constitutes a denial of due process.Tibbs v. Florida (1982), 457 U.S. 31, 45 * * *, citing Jackson v.Virginia (1979), 443 U.S. 307 * * *." (Parallel citations omitted) Id. at 386-387.
 {¶ 33} When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v.Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at _17. Further, we note that the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997),79 Ohio St.3d 421, 430.
 MARKED LANES VIOLATION {¶ 34} In his first assignment of error, Quinones argues that the evidence was not sufficient to convict him of "marked lanes or continuous lines of traffic" in violation of MHO 432.08(a).[3]
 {¶ 35} The relevant portion of MHO 432.08 provides: *Page 11 
 {¶ 36} "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within the Municipality traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules applies:
 {¶ 37} "(a) A vehicle shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from the lane or line until the driver has first ascertained that the movement can be made with safety."[4]
 {¶ 38} Quinones relies on State v. Gullett (1992), 78 Ohio App.3d 138, for his proposition that "[a] de minimus [sic] marked lanes violation, without other evidence of impairment, does not justify an investigative stop." He also argues that "Gullett further holds that any de minimus [sic] marked lanes violation is not sufficient to sustain a conviction." We sustain Quinones' first assignment of error, but for different reasons, as explained in the following analysis. *Page 12 
 {¶ 39} Gullett, as well as other early Ohio cases, "held that minor weaving over a lane line with no evidence to show how long or how far the driver so traveled would not in itself justify a stop, particularly when no other traffic is present and the driver was not speeding or otherwise driving erratically." State v. Clark, 6th Dist. No. S-03-039,2004-Ohio-2774, at _23. See, also, State v. Drogi (1994),96 Ohio App.3d 466 (held that insubstantial drifts across lane lines do not give rise to a reasonable and articulable suspicion sufficient to make a traffic stop).
 {¶ 40} However, subsequent cases from the United States Supreme Court in Whren v. United States (1996), 517 U.S. 806 and the Ohio Supreme Court, three weeks later in Dayton v. Erickson (1996), 76 Ohio St.3d 3, called Gullett and similar cases into question. Clark at _24. InClark, the Sixth District, quoting the Ohio Supreme Court, stated:
 {¶ 41} "`where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation,including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question.'" (Emphasis sic.) Clark at _24, quoting Erickson at 11-12.
 {¶ 42} The Sixth District court further explained at ¶ 25-26:
 {¶ 43} "Since Erickson, Ohio appellate courts have similarly held that any minor traffic offense justifies stopping the driver. See, e.g.,State v. Hodge, *Page 13 147 Ohio App. 3d 550, 2002-Ohio-3053, at _27 (overruling Drogi) and cases cited therein. Hodge, like the instant case, also involved a violation of R.C.4511.33. Criticizing its previous cases in which it tried to discern, on a case-by-case basis, whether drifting out of a lane was substantial enough to justify stopping a car, the court in Hodge stated:
 {¶ 44} `"In each instance we are in effect second-guessing whether a violation rose to the level of being "enough" of a violation for reasonable suspicion to make the stop. Pursuant to Whren andErickson, we must recognize that a violation of the law is exactly that — a violation. Trial courts determine whether any violation occurred, not the extent of the violation. Based upon the foregoing analysis, we explicitly overrule Drogi, as it is contrary to the subsequent decisions of Whren and Erickson.'"
 {¶ 45} In addition to the Sixth District in Clark and the Seventh District in Hodge, other appellate districts also determined thatGullett and its progeny were effectively overruled by Whren andErickson. See State v. Lopez, 166 Ohio App.3d 337, 2006-Ohio-2091, citing Hodge (First District); State v. Spillers (Mar. 24, 2000), 2d Dist. No. 1504, 2000 Ohio App. LEXIS 1151; McComb v. Andrews (Mar. 22, 2000), 3d Dist. No. 5-99-41, 2000 Ohio App. LEXIS 1134; State v.Williams (June 18, 2001), 12th Dist. No. CA2000-11-029, 2001 Ohio App. LEXIS 2684.
 {¶ 46} In a recent fifty-seven page opinion, the Third District extensively reviewed the legislative history of R.C. 4511.33(A)(1), Ohio courts' interpretation of *Page 14 
the statute, as well as other states' interpretation of it (since it is based upon the Uniform Traffic Code), the effect of Whren andErickson on the statute (which we have already briefly discussed), case law prior to and after these two landmark cases, and why it decided to overrule its prior precedent and adopt its first interpretation of the statute, which is "a two-prong interpretation" of the provision.[5]Phillips, supra, at _49-50.
 {¶ 47} The Phillips court quoted "the Tenth District's] concisely stated" opinion in State v. East (June 28, 1994), 10th Dist. Nos. 93APC09-1307 and 93APC09-1308, 1994 Ohio App. LEXIS 2834:
 {¶ 48} "R.C. 4511.33(A) does not proscribe all movements across lane lines. Rather, it apparently is intended to require, as nearly as `practicable,' that a driver maintain his vehicle in one lane of travel, and if a change of lanes is to be made, the driver first must ascertain that it can be made with safety. As a result, a driver's simply crossing a lane line in itself is insufficient to establish a prima facie violation of R.C. 4511.33(A); the evidence must address additional conditions of practicality and safety, for which the state bears the burden of proof." Phillips at _49.
 {¶ 49} The Phillips court explained that it still stood behind its decisions which have held "that any violation of a traffic law, including de minimis traffic violations, *Page 15 
give police officers the ability to make a constitutional stop of a motorist * * *." Id. at 65. However, under its two-prong interpretation of R.C. 4511.33(A), a police officer is required to "witness (1) a motorist not driving his or her vehicle within a single lane or line of travel as nearly as is practicable; and (2) a motorist not first ascertaining that it is safe to move out of that lane or line of travel before doing so * * *." (Emphasis sic.) Id. The court noted that it "recognized this standard might be burdensome for both police officers and prosecutors," but believed that the Legislature did not intend for motorists to be "perfect" drivers, but rather "reasonable" drivers.[6]
Id.
 {¶ 50} The Phillips court further supported its interpretation of R.C.4511.33(A) by adopting an "updated definition" of "practicable." It stated at _70:
 {¶ 51} "The current version of Black's Law Dictionary comports with the Ohio Supreme Court's definition of practicable. Black's Law Dictionary (8 Ed. 2004) defines practicable as `reasonably capable of being accomplished; feasible.' See State ex rel. Fast Co. v. Indus.Comm. (1964), 176 Ohio St. 199, 201 * * *. ('* * * capable of being put into practice or accomplished'.) This definition has also been adopted by the Sixth District in State v. Noss (Nov. 30, 2000), 6th Dist. No. WD-00-016, 2000 Ohio App. LEXIS 5579. In Noss, the Sixth District defined *Page 16 
`practicable' as `"capable of being put into practice or of being done or accomplished: FEASIBLE (* * *)."' Id. Therefore, if we were to insert the definition, currently supported by the Ohio Supreme Court and Black's Law Dictionary, into the statute in place of the word `practicable,' R.C. 4511.33(A)(1) would read: `A vehicle or trackless trolley shall be driven, as nearly as reasonably capable of being accomplished, entirely within a single lane or line of traffic (* * *).'"
 {¶ 52} Quoting the oft-cited concurring opinion of Judge Harsha inNelsonville v. Woodrum (Nov. 20, 2001), 4th Dist. No. 00CA50, 2001 Ohio App. LEXIS 6062, the Phillips court further remarked that: "`de minimis weaving and/or crossing of the marked lanes does not always justify a traffic stop based upon either the Terry standard or probable cause[, because] of the "as nearly as practicable" language of R.C. 4511.33(A).' * * * Judge Harsha concludes and we agree, `In other words, I construe that language to be the legislature's recognition that every de minimiscrossing of marked lanes is not a traffic violation.' Id. (emphasis added). This interpretation, coupled with the second prong requiring that movements outside of the lane or line of travel shall not be completed without first ascertaining that doing so may be completed safely, reinforces our belief that crossing the right white edge line is not a violation of R.C. 4511.33(A) per se." Phillips at _73. *Page 17 
 {¶ 53} The Ninth District has reached the same conclusion in State v.Barner, 9th Dist. No. 04CA0004-M, 2004-Ohio-5950. It held, "[i]t is clear from a plain reading of the statute that in order to sustain a conviction pursuant to R.C. 4511.33(A), the State must put forth evidence that the driver of a vehicle moving either between lanes of traffic or completely out of a lane of traffic failed to ascertain the safety of such movement prior to making the movement." Id. at _14. The court explained that the record in the case showed that "the State never asked its own witness, Officer McKenna, if he witnessed Appellant leave his lane of traffic without first ascertaining whether or not such movement could be done with safety. Furthermore, the State also never asked Appellant if he left his lane of traffic without first ascertaining whether or not such movement could be done with safety. As a result, the record is devoid of any evidence that Appellant left his lane of traffic without first ascertaining whether or not such movement could be done with safety." Id. The court concluded that, "[b]ecause there was no evidence presented on an essential element of the offense, the trial court had no evidence to weigh on this element of the offense when determining whether or not Appellant was guilty of failure to drive within a marked lane." Id. at _15.
 {¶ 54} We agree with the Third District's well-reasoned decision inPhillips and the Ninth District's decision in Barner. R.C. 4511.33(A) requires that a motorist drive *Page 18 as nearly as practicable within his lane or line of travel and not move from that lane or line of travel until the motorist has first determinedthat it can be done with safety.
 {¶ 55} Although the issue in the case sub judice is whether there was sufficient evidence to convict, we are compelled to point out that our decision does not stand for the proposition that movement within one lane will never justify articulable, reasonable suspicion to effectuate a Terry stop (investigative stop).[7]
 {¶ 56} Furthermore, we emphasize that any de minimis violation of R.C.4511.33(A) would be sufficient probable cause to warrant a traffic stop. However, it must be just that — a violation. Every de minimis touching or crossing of marked lanes is not a traffic violation.Phillips, supra, quoting Woodrum, supra (Judge Harsha's concurring opinion). In addition, there must be some evidence regarding the safety prong of the statute.
 {¶ 57} Turning to the case at bar, we conclude that the city failed to submit sufficient evidence on either of the essential elements of R.C.4511.33(A). Regarding the first element, the practicable prong, the testimony established that Quinones "occasionally" drove on the double yellow line for approximately three-quarters of a mile. However, Officer Bulka admitted on cross-examination that Quinones did not "go into the other lane." We have independently verified that the videotape does not *Page 19 
show Quinones crossing over the yellow line into the other lane. He did touch the yellow line twice as far as this court could tell, but he did not leave his lane of traffic. Moreover, he did not swing back into his lane, or weave back and forth in an unsafe manner.
 {¶ 58} As for the second element, the safety prong, the city did not present any evidence as to whether Quinones left his lane of traffic without first ascertaining whether it was safe to do so. As we indicated, Officer Bulka testified that Quinones never went left of center into the lane of oncoming traffic.
 {¶ 59} On cross-examination, however, Officer Bulka could not recall if a car was traveling in the opposite direction when he was following Quinones. The videotape shows one car traveling in the opposite direction at the beginning of the tape, but Quinones does not travel into the car's lane of traffic or even touch the yellow line at that point.
 {¶ 60} Thus, the city failed to present sufficient evidence on either of the essential elements of the marked lane ordinance. As such, Quinones' first assignment of error is well taken.
 SPEEDING VIOLATION {¶ 61} In his second assignment of error Quinones asserts that based upon the sufficiency of the evidence, the trial court erred in finding him guilty of speeding in *Page 20 
violation of MHO 434.03(b)(2). Specifically, Quinones argues that Officer Bulka's visual estimation of his speed was not sufficient and that Officer Bulka's pacing was not reliable, and therefore not sufficient to convict him.
 {¶ 62} MHO 434.03, entitled maximum speed limits; assured clear distance ahead, states:
 {¶ 63} "[i]t is prima facie lawful, in the absence of a lower limit declared pursuant to this section by the Director of Transportation or local authorities, for the operator of a motor vehicle to operate the same at a speed not exceeding the following:
 {¶ 64} "(b)(2) twenty-five miles per hour in all other portions of the Municipality, except on the state routes outside business districts, through highways outside business districts, and alleys."
 {¶ 65} We agree with Quinones that an arresting officer's visual estimates of speed alone are insufficient to convict persons of speeding beyond a reasonable doubt. See Cleveland v. Wilson, 8th Dist. No. 87047,2006-Ohio-1947, at _7. However, as Quinones himself points out, that was not the only evidence presented. Officer Bulka testified that he paced Quinones' vehicle to determine his speed. Many Ohio courts, including this district, have found that pacing a car is an acceptable manner for determining speed. State v. Horn, 7th Dist. No. 04BE31, *Page 21 2005-Ohio-2930, at _18; Middleburg Heights v. Campbell, 8th Dist. No. 87593, 2006-Ohio-6582, at _17.
 {¶ 66} In the instant case, Officer Bulka testified that he paced Quinones' vehicle by first verifying that his own speedometer was accurate. He checked his own speedometer reading against the Gemini radar detector. He also explained that he conducted the Gemini radar unit's self-calibration at the beginning of his shift, and the unit was operating properly. He stated that he paced Quinones' vehicle for approximately three quarters of a mile, keeping his vehicle an equal distance from Quinones by counting and using mailboxes, telephone poles, and trees. He then estimated Quinones' speed to be fifty-three m.p.h.
 {¶ 67} After viewing the evidence in a light most favorable to the prosecution, we conclude the evidence was sufficient for a reasonable trier of fact to convict Quinones beyond a reasonable doubt of speeding. As such, Quinones' second assignment of error is overruled.
 OMVI VIOLATION {¶ 68} In his third assignment of error, Quinones argues that the evidence was not sufficient to convict him of operating a motor vehicle under the influence of alcohol in violation of MHO 434.01(a)(1), which provides: "No person shall operate any vehicle within this Municipality if * * * the person is under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse." *Page 22 
 {¶ 69} Quinones maintains that Officer Bulka did not administer the field sobriety tests under the strict compliance standard set forth inState v. Homan (2000), 89 Ohio St.3d 421.
 {¶ 70} We note at the outset that Quinones bases his entire argument on a case that is no longer good law. It is now well established that the strict compliance standard established in Homan was rendered invalid by the General Assembly in 2002. State v. Boczar, 113 Ohio St.3d 148,2007-Ohio-1251, at _10-11. The General Assembly amended R.C.4511.19(D)(4)(b) in Am. Sub. S.B. 163 to require only substantial compliance. Id. at _11-12. Recently, the Supreme Court of Ohio unanimously upheld the constitutionality of R.C. 4511.19(D)(4)(b) inBoczar, syllabus.
 {¶ 71} Nevertheless, even assuming the results of the field sobriety tests should have been excluded under the proper substantial compliance standard, an officer's observations regarding a defendant's performance on field sobriety tests is admissible as lay evidence of intoxication.State v. Schmitt, 101 Ohio St.3d 79, 2004-Ohio-37, at ¶ 12-15. "The manner in which a defendant performs these tests may easily reveal to the average lay person whether the individual is intoxicated." Id. at Tf14. The Supreme Court reasoned, "[w]e see no reason to treat an officer's testimony regarding the defendant's performance on a nonscientific field sobriety *Page 23 
test any differently from his testimony addressing other indicia of intoxication, such as slurred speech, bloodshot eyes, and odor of alcohol." Id.
 {¶ 72} The high court further reasoned, "[u]nlike actual test results, which may be tainted, the officer's testimony is based upon his or her firsthand observation of the defendant's conduct and appearance. Such testimony is being offered to assist the [trier of fact] in determining a fact in issue, i.e., whether a defendant was driving while intoxicated. Moreover, defense counsel [has] the opportunity to cross-examine the officer to point out any inaccuracies and weaknesses. We conclude that an officer's observations in these circumstances are permissible lay testimony under Evid.R. 701." Id. at ¶ 15.
 {¶ 73} In the case sub judice, even assuming Officer Bulka did not substantially comply with NHTSA standards, and the test results of the field sobriety tests should have been excluded, his observations regarding Quinones' performance of these tests were admissible and could be considered by the trier of fact.
 {¶ 74} Officer Bulka testified that he had nearly seventeen years of experience in law enforcement. He further indicated that he had dealt with intoxicated people many times. Officer Bulka testified that Quinones was speeding, had occasionally driven on the yellow line, that his vehicle smelled of alcohol, and that Quinones had glassy eyes. Furthermore, Quinones failed all six HGN clues, was not able to *Page 24 
maintain his balance during the walk-and-turn test, swayed while standing during the one-leg test, and could not hold his foot up during the test. Moreover, Quinones refused to take a breath test, which can also be considered evidence of intoxication. See South Dakota v.Neville (1983), 459 U.S. 553; Columbus v. Maxey (1988),39 Ohio App.3d 171. Thus, in a light most favorable to the prosecution, and after viewing the totality of the facts and circumstances, we conclude that there was sufficient evidence presented to convict Quinones of OMVI beyond a reasonable doubt.
 {¶ 75} Accordingly, Quinones' third assignment of error is overruled.
 SEATBELT VIOLATION {¶ 76} In his fourth assignment of error, Quinones argues that the trial court erred in finding him guilty of failure to wear a seat belt in violation of MHO 438.275(b)(1). Quinones maintains that the evidence was insufficient because Officer Bulka observed him with his seatbelt off only after he ceased operating the vehicle.
 {¶ 77} MHO 438.275(a)(1) defines occupant restraining devices as "a seat belt, shoulder belt, harness, or other safety device for restraining a person who is an operator of or passenger in an automobile and that satisfies the minimum Federal vehicle safety standards established by the United States Department of Transportation." MHO 438.275(b)(1) provides that "no person shall * * * operate an *Page 25 
automobile on any street or highway unless he or she is wearing all of the available elements of a properly adjusted occupant restraining device."
 {¶ 78} This court has held that in order to establish a seat belt violation, the state is required to show that the appellant operated his vehicle on a street or highway without wearing all the elements of his properly adjusted occupant restraining device. Cleveland v. Tate (May 17, 2001), 8th Dist. No. 78789, 2001 Ohio App. LEXIS 2183, at 3-4, citing Newburgh Heights v. Halasah (1999), 133 Ohio App. 3d 640, 647.
 {¶ 79} In the instant case, the only evidence presented regarding the seat belt violation was when the city asked Officer Bulka, "[a]nd when you stopped the vehicle was the defendant wearing his seat belt?" Officer Bulka replied, "[n]o." Thus, we agree with Quinones that the city did not establish that he operated his vehicle without wearing his seat belt. As such, the evidence was not sufficient beyond a reasonable doubt to convict him of a seat belt violation.
 {¶ 80} Accordingly, Quinones' fourth assignment of error is well taken.
 COURT COSTS {¶ 81} In his fifth assignment of error, Quinones contends that the trial court's imposition of court costs for each offense is excessive and violates his right to fair punishment. Quinones asserts that he was cited with only one ticket, and his case had only one case number for all four counts. Thus, he maintains that any *Page 26 
conviction should result in one court cost being assessed, not four. For the following reasons, we agree.
 {¶ 82} Ohio has a complex system for assessing and collecting fines and costs in misdemeanor cases, and it differs from jurisdiction to jurisdiction. Ohio Criminal Sentencing Commission Staff Report, A Decade of Sentencing Reform (Mar. 2007), 30. Further, there appears to be a dearth of case law interpreting the statutes regarding court costs.State v. Powers (1996), 117 Ohio App.3d 124, 128.
 {¶ 83} "[C]osts are taxed against certain litigants for the purpose of lightening the burden on taxpayers financing the court system."State v. Threatt, 108 Ohio St.3d 277, 2006-Ohio-905, at _15, citingStrattman v. Studt (1969), 20 Ohio St.2d 95, 102. "[Although costs in criminal cases are assessed at sentencing and are included in the sentencing entry, costs are not punishment, but are more akin to a civil judgment for money." Id.
 {¶ 84} As stated in State ex rel. Commrs. of Franklin Cty. v. Guilbert(1907), 77 Ohio St. 333, 338-39:
 {¶ 85} "Costs, in the sense the word is generally used in this state, may be defined as being the statutory fees to which officers, witnesses, jurors and others are entitled for their services in an action or prosecution and which the statutes authorize to be taxed and included in the judgment or sentence. The word does not have a fixed legal signification. As originally used it meant an allowance to a party for expenses incurred in prosecuting or defending a suit. Costs did not necessarily *Page 27 
cover all of the expenses and they were distinguishable from fees and disbursements. They are allowed only by authority of statute."
 {¶ 86} R.C. 2947.23, judgment for costs and jury fees, provides:
 {¶ 87} "(A)(1) In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution and render a judgment against the defendant for such costs. * * *"
 {¶ 88} R.C. 1901.26(A)(1)(a) requires the municipal court "to establish a schedule of fees and costs to be taxed in any civil or criminal action or proceeding."
 {¶ 89} There do not appear to be any cases directly on point that interpret the phrase found in R.C. 2947.23, "[i]n all criminal cases * * *." However, there are two 1991 Ohio Attorney General Opinions that addressed the meaning of "case" in similar statutes, R.C. 2743.70 and2949.091, and are instructive for our analysis in the case at bar.[8] *Page 28 
 {¶ 90} In 1991 Ohio Atty.Gen.Ops. No. 91-022, the Attorney General opined in the syllabus that, "[t]he court costs imposed by R.C.2743.70(A)(1) and R.C. 2949.091(A)(1) are to be charged per case, and not per offense."
 {¶ 91} The Attorney General reasoned:
 {¶ 92} "An examination of the language of R.C. 2743.70(A)(1) and R.C.2949.091(A)(1) clearly reveals that a court shall impose the specific sum of money, mandated by these sections, `as costs in the case.' The language of R.C. 2743.70(A)(1) and R.C. 2949.091(A)(1), thus, unambiguously discloses that the General Assembly's intention in enacting these sections was to provide for the imposition of a specific sum of money as costs in any case in which a person is convicted of or pleads guilty * * *. [N]either R.C. 2743.70 nor R.C. 2949.091 sets forth a definition for the term `case.' Terms not statutorily defined are to be accorded their common or ordinary meaning. R.C. 1.42 * * *. Black's Law Dictionary 215 (6th Ed. 1990) defines the term `case' as `an aggregate of facts which furnishes occasion for the exercise of the jurisdiction of a court of justice.' It is clear, therefore, that the costs mandated in R.C. 2743.70 and R.C. 2949.091 are to be imposed when an aggregate of facts furnishing a court the opportunity to exercise its jurisdiction *Page 29 
results in a person being convicted of or pleading guilty to any offense * * *." Id. at 4-5.
 {¶ 93} The Attorney General further considered that "prior to and subsequent to the enactment of R.C. 2743.70 and R.C. 2949.091, it has been the continual practice in Ohio for offenses to be joined in one case for purposes of facilitating the administration of justice." Id. at 5. "Aware of this common practice, the General Assembly made no attempt, through the language of R.C. 2743.70 and R.C. 2949.091, to indicate that the costs mandated by these sections were conditioned upon the number of offenses of which a person was convicted or to which he plead guilty in a single case. Rather, language set forth in these sections indicates the contrary." Id. at 8.
 {¶ 94} Five months later, in 1991 Ohio Atty.Gen.Ops. No. 91-039, the Attorney General opined that, "[i]f an individual is charged with more than one misdemeanor arising from the same act or transaction or series of acts or transactions, and a municipal court or a county court assigns a single case number with respect to the prosecution of these misdemeanors, while simultaneously distinguishing between each misdemeanor charged within that case number by attaching an additional identifier, each misdemeanor charged within that case number is not considered a `case' for purposes of assessing the court costs mandated by R.C. 2743.70 and R.C. 2949.091." Id. at syllabus. *Page 30 
 {¶ 95} In this opinion, the Attorney General reaffirmed his position in 1991 Ohio Atty.Gen.Ops. No. 91-022 and also took into consideration the Rules of Superintendence for Municipal Courts and County Courts. He stated:
 {¶ 96} "Under M.C. Sup. R. 12(E), municipal courts and county courts may only assign one case number in situations in which an individual is charged with more than one offense arising from the same act, transaction, or series of acts or transactions. * * * Supreme Court of Ohio, The Supreme Court of Ohio Rules of Superintendence Implementation Manual 225 (January 1, 1990). * * *." Thus, "[i]t is apparent from the foregoing that the Ohio Supreme Court has determined that when an individual is charged with more than one misdemeanor arising from the same act, transaction, or series of acts or transactions, a municipal court or county court may only assign one case number to that criminal prosecution. Consequently, all the misdemeanors charged within that criminal prosecution are part of one case." Id. at 9.
 {¶ 97} It is our view that the Attorney General's reasoning with respect to assessing additional costs is instructive in the case at bar. When applying the plain language of the R.C. 2947.23, "[i]n all criminal cases[,]" it is our view that court costs should be assessed for each case and not for each offense. As such, Quinones' fifth assignment of error is well taken.
 {¶ 98} Thus, Quinones' second and third assignments of error challenging his speeding and OMVI convictions are affirmed. His marked lanes and seat belt *Page 31 
violations are reversed, and the case is remanded for imposition of only one set of court costs. The judgment of the Berea Municipal Court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Berea Municipal Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, P.J., and CHRISTINE T. McMONAGLE, J., CONCUR
[1] According to the transcript, Officer Bulka testified that Quinones' eyes were" glassy" and something else, but it was inaudible.
[2] Officer Bulka never testified as to what the third clue was.
[3] We note that the majority of cases interpreting the analogous Revised Code section of a marked lane violation, R.C. 4511.33(A)(1), address whether the police officer had articulable, reasonable suspicion or probable cause to stop a defendant, not whether the evidence was sufficient to convict a defendant of a marked lane violation. Nevertheless, these cases are instructive to our analysis in the case at bar.
[4] MHO 433.08(a) is nearly identical to R.C. 4511.33(A)(1), except that the Revised Code section includes "trackless trolley." R.C.4511.33(A)(1) provides: "A vehicle or trackless trolley shall be driven * * *." Thus, we will use cases interpreting R.C. 4511.33(A)(1) in our analysis.
We further note that R.C. 4511.33, "Rules for driving in marked lanes," is "patterned after Section 11-309(a) of the Uniform Vehicle Code authored by the National Committee on Uniform Traffic Laws and Ordinances." State v. Phillips, 4th Dist. No. 8-04-25, 2006-Ohio-6338, at _40. Unif. Vehicle Code _11-309(a) (2000) states:
"Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
"(a) A vehicle shall be driven, as nearly as practicable, entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Phillips at _40.
[5] "Section C" of the Phillips' decision, the relevant portion of the opinion to the case at bar, is labeled: "R.C. 4511.33(A) — Marked Lanes Violation" and is thirty-two pages long. See Id. at _37-73.
[6] We point out that the Phillips court explicitly limited its decision to cases where the motorist crosses only the right edge (white) line, commonly known as the fog line, on a divided two-lane roadway. Id. at _50. However, we believe that the reasoning is applicable to the case at bar.
[7] There is no law in Ohio prohibiting per se weaving within one lane. However, at least one appellate district has upheld a local ordinance with such provisions. Hodge, supra, at _59, citingCuyahoga Falls v. Morris (Aug. 19, 1998), 9th Dist. No. 18861, 1998 Ohio App. LEXIS 3762, and State v. Carver (Feb. 4, 1998), 9th Dist. No. 2673-M, 1998Ohio App. LEXIS 345.
[8] R.C. 2743.70 (addressing additional costs in the court of claims) and R.C. 2949.091 set forth provisions concerning the imposition of additional court costs and bail against nonindigent persons. R.C.2743.70 provides:
"(A)(1) The court, in which any person is convicted of or pleads guilty to any offense other than a traffic offense that is not a moving violation, shall impose the following sum as costs in the case in addition to any other court costs that the court is required by law to impose upon the offender:
"(a) Thirty dollars, if the offense is a felony;
"(b) Nine dollars, if the offense is a misdemeanor.
"The court shall not waive the payment of the thirty or nine dollars court costs, unless the court determines that the offender is indigent and waives the payment of all court costs imposed upon the indigent offender. * * *"
R.C. 2949.091(A)(1) similarly provides:
"The court, in which any person is convicted of or pleads guilty to any offense other than a traffic offense that is not a moving violation, shall impose the sum of fifteen dollars as costs in the case in addition to any other court costs that the court is required by law to impose upon the offender. * * * The court shall not waive the payment of the additional fifteen dollars court costs, unless the court determines that the offender is indigent and waives the payment of all court costs imposed upon the indigent offender." *Page 1